# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 19-0897** (Wood County 18-F-94)

**Jessica N. Roberts,**
**Defendant Below, Petitioner**


# MEMORANDUM DECISION


Petitioner Jessica N. Roberts, by counsel Donald L. Stennett, appeals her convictions for first-degree murder, first-degree robbery, burglary, grand larceny, and conspiracy to commit murder. Respondent State of West Virginia by counsel Benjamin F. Yancey, III, filed a response in support of petitioner's convictions.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On December 11, 2017, Penni Jo Curtiss ("the victim") was murdered in her home in Parkersburg, West Virginia, her home was ransacked, and many of her belongings (including her vehicle) were stolen.[1] The victim's body was discovered, on December 12, 2017, by her parents, who subsequently called 9-1-1. Sergeant James Stalnaker of the Parkersburg Police Department ("PPD") responded to the crime scene with a team of investigators.

As the PPD searched the victim's home, the officers found blood covering the walls, door, furniture, and carpet. Swabs of the blood were collected, the home was "dusted" for latent prints, and the victim's remains were sent to the medical examiner's office for autopsy. Ultimately, Deputy Chief Medical Examiner Piotr Kubiczek determined that cause of the victim's death was "multiple blunt force injuries of significant conditions" and "multiple sharp force injuries." Dr. Kubiczek further determined the manner of the victim's death to be homicide.

---

[1] The record reflects that the physical attack of the victim began in the late evening of December 11, 2017, at approximately 9:00 p.m.; however, it is unclear if the victim succumbed to her injuries on December 11, 2017, or in the early morning hours of December 12, 2017.

During their investigation, the PPD canvassed the victim's neighborhood and discovered that the victim's neighbor had a video surveillance system with a camera on each corner of his home. On December 11, 2017, at approximately 7:24 am, one of the neighbor's cameras "captured a male walking toward the back of [the victim's] porch, dislodging [the] air conditioner, and crawling through the window." The neighbor identified Kenneth McCoy, Jr., (petitioner's then boyfriend) as the man in the video. Further, the neighbor noted that Mr. McCoy returned to the victim's home later that morning with a backpack and had a conversation with petitioner at the end of the driveway of the victim's home. The neighbor then observed petitioner and Mr. McCoy walk toward the basement door of the victim's home, but the neighbor did not think anything of the mid-day visit as people, including petitioner and Mr. McCoy, often visited the victim's daughter while the victim was at work.

PPD Detectives then interviewed the victim's daughter who advised that she had lived with the victim until December 1, 2017. The daughter advised that petitioner also lived with her and the victim during the fall of 2017 and that Mr. McCoy would sometimes visit petitioner at the victim's home. Petitioner moved out of the victim's home a few weeks prior to the time the victim's daughter moved out. Based upon the surveillance video and interviews of the victim's neighbor and the victim's daughter, detectives determined that petitioner and Mr. McCoy were suspects in the victim's murder.

On December 14, 2017, in Illinois, Officer Mark Weber and Assistant Chief Drury of the Flora Police Department responded to a complaint about a man in a silver minivan requesting gas money from patrons at a nearby convenience store. By the time that Officer Weber arrived at the convenience store, the vehicle and the man were gone, but were reported to be seen headed in the direction of the local Walmart. Officer Weber then traveled to the parking lot of the Walmart and observed a vehicle matching the description of the vehicle from the convenience store. The vehicle was unoccupied. Upon locating the vehicle, Officer Weber "ran the [license] plate" through dispatch and the "plate came back as being stolen." Officer Weber then exited his vehicle and looked through the windshield of the minivan at the VIN[2] plate and "called in the number to dispatch." The VIN "came back as being involved in a homicide in West Virginia." Hoping that someone would return to the vehicle, Officer Weber parked his squad car a few rows away and waited. Ultimately, petitioner and Mr. McCoy returned to the vehicle and were arrested.

That same day, Sergeant Stalnaker and Detective Hart of the PPD learned of petitioner's and Mr. McCoy's arrests and, the next morning, Stalnaker and Hart traveled to Illinois to "retrieve evidence" gathered as a result of the arrests. On December 15, 2017, while still in Illinois, Sergeant Stalnaker and Detective Hart interviewed Ms. Roberts.[3] Prior to her interview, Ms. Roberts signed a written waiver of her *Miranda*[4] rights and voluntarily consented to give a statement, which

---

[2] Vehicle Identification Number

[3] Ms. Roberts provided a second statement on December 27, 2017, after she returned to West Virginia.

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

2

detailed the events surrounding the victim's murder and implicated Ms. Roberts and petitioner. During this time, Ms. Roberts also provided the PPD officers with a DNA swab.

In her initial statement, petitioner disclosed that on December 11, 2017, Mr. McCoy broke into the victim's home and then let petitioner into the home. Petitioner and Mr. McCoy then waited for the victim to return home from work and, when she entered the home, Mr. McCoy "attacked [the victim] with a hammer, striking her forcefully on the head repeatedly, then, covering her head with a pillow, proceeded to cut her throat." Petitioner admitted that she and Mr. McCoy then took various items from the victim's home including credit cards, checks, and the victim's vehicle.

Following the initial interview of petitioner, Detective Hart, with the help of Illinois police, processed the van. The van was found to contain a hammer, a machete, a designer bag with the victim's name on it, a suitcase with petitioner's and the victim's prescriptions in it, the victim's wallet, and cash advance paperwork bearing the victim's name. The following morning, after his execution of a written waiver of his *Miranda* rights, Sergeant Stalnaker and Detective Hart interviewed Mr. McCoy. Mr. McCoy provided a lengthy statement in which he detailed his role in the victim's murder. Additionally, Mr. McCoy provided a DNA swab for testing.

Information gleaned through Mr. McCoy's interview led to the search of a dumpster at a facility in West Virginia where a backpack belonging to Mr. McCoy and certain items from the murder scene and items belonging to the victim were discovered.[5] Additionally, the facility where the dumpster was located provided surveillance footage which depicted a person exiting the victim's van, matching the description of Mr. McCoy, place items into the dumpster.

Petitioner and Mr. McCoy were arrested on fugitive warrants on December 14, 2017, and, on December 18, 2017, they both waived extradition to West Virginia. On December 27, 2017, petitioner and Mr. McCoy were transported to West Virginia and charged with the murder of the victim. After her return to West Virginia on December 27, 2017, petitioner gave another statement to law enforcement officers related to the victim's murder.

On March 7, 2018, a West Virginia Grand Jury returned an indictment charging petitioner with murder, first-degree robbery, burglary, grand larceny, and conspiracy to commit murder. During pre-trial proceedings, petitioner filed a motion to suppress the two statements she made to law enforcement officers while in custody. A hearing on petitioner's motion to suppress was held on April 5, 2019. Subsequently, at the May 24, 2019, pre-trial conference, petitioner's motion was denied.

Petitioner's trial, and the joint trial of her co-defendant, Mr. McCoy, commenced in May of 2019. Neither petitioner nor Mr. McCoy testified at trial, but recordings of their statements were played during trial. Ultimately, the jury found both petitioner and Mr. McCoy guilty of first-degree

---

[5]Specifically, PPD officers discovered a box cutter, two hammers, a knife, a blood saturated couch cushion, a bag bearing the victim's name and address, a white trash bag containing a blood saturated pillow, a blood saturated piece of blue carpet and carpet padding, a bag containing male clothing, a bag containing female clothing, and a copy of the victim's driver's license and social security card.

murder, first-degree robbery, conspiracy to commit a criminal offense, burglary, and grand larceny.

On August 12, 2019, petitioner was sentenced. For her conviction of first-degree murder, petitioner was sentenced to life with mercy. As to her conviction of conspiracy to commit murder, she was sentence to a term of one to five years. For her conviction for first-degree robbery, petitioner was sentenced to a determinate term of twenty years. As to her conviction for burglary, she was sentenced to an indeterminate term of one to ten years. For her conviction of grand larceny, petitioner was sentenced to term of one to ten years. All of petitioner's convictions were ordered to be served consecutively. It is from her convictions that petitioner now appeals.

On appeal, petitioner raises two assignments of error, which we will address in turn. First, petitioner contends that the trial court erred in denying her motion to suppress the two statements she provided to law enforcement officers. This Court employs a two-tiered standard of review of a circuit court's ruling on a motion to suppress.

> [W]e first review a circuit court's findings of fact when ruling on a motion to suppress evidence under the clearly erroneous standard. Second, we review *de novo* questions of law and the circuit court's ultimate conclusion as to the constitutionality of the law enforcement action. Under the clearly erroneous standard, a circuit court's decision ordinarily will be affirmed unless it is unsupported by substantial evidence; based on an erroneous interpretation of applicable law; or, in light of the entire record, this Court is left with a firm and definitive conviction that a mistake has been made. . . . When we review the denial of a motion to suppress, we consider the evidence in the light most favorable to the prosecution.

*State v. Lilly*, 194 W. Va. 595, 600, 461 S.E.2d 101, 106 (1995). Further, this Court has held that

> [w]hen reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

Syl. Pt. 1, *State v. Deem*, 243 W. Va. 671, 849 S.E.2d 918 (2020) (citation omitted).

As to the voluntariness of a confession, this Court has held that "[a] trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syl. Pt. 3, *State v. Vance*, 162 W. Va. 467, 250 S.E.2d 146 (1978). Further, this Court has reasoned that "the voluntariness of a confession is an inquiry that must be gauged by the totality of the circumstances under which it was given including the background, experience [,] and conduct of the accused." *State v. Persinger*, 169 W. Va. 121, 129, 286 S.E.2d 261, 267 (1982).

While petitioner acknowledges that she signed a written waiver of her *Miranda* rights and voluntarily gave statements, which detailed the events surrounding the victim's murder and her and Mr. McCoy's involvement in the murder, she now contends that because of her limited psychological[6] and intellectual abilities she lacked the ability to make a knowing and intelligent waiver of her right to counsel. Further, petitioner contends that she, on multiple occasions, told officers that she wanted an attorney and "expressed her concern over whether she would be allowed one in West Virginia" Petitioner argues that it was not clear to her that she was entitled to an attorney when providing her statements. However, respondent asserts that after making comments in each of her statements relating to the appointment of an attorney, petitioner "clarified that she fully understood her rights and that she understood that she did not have to talk to [law enforcement officers], but that she wished to talk to them."

During her initial statement, petitioner was asked specifically if she understood her rights and understood that she did not have to talk to law enforcement officers, to which petitioner responded, "Yeah I understand that, but I want to." In fact, during her second statement, petitioner was directly asked "Do you wish to answer any questions we may have for you? . . .Without an attorney present?" to which petitioner responded, "Yes." Further, the testimony of Detective Hart from the suppression hearing established that during his interview of petitioner "she never requested an attorney" and did not in any manner, by words or actions, indicate that she no longer wished to speak with the officers. As to petitioner's alleged psychological and intellectual deficiencies, in his October 26, 2018, report from his forensic psychological evaluation of petitioner, psychologist Eric Walls noted that petitioner "has the rational ability to consult with her counsel and has both a factual and rational understanding of the proceedings" and was "competent to stand trial."

As to petitioner's statements, the circuit court specifically found that

> given the totality, I think [petitioner] knowingly, intelligently [,] and voluntarily waived her Fifth Amendment and Sixth Amendment rights – the right to remain silent, the right to counsel, although the counsel issue was highly contested. I think if you look at all the evidence in its totality, that she knew her rights and waived those rights, particularly on the waiver sheet and then some followup questions. So, her statements both in Illinois and in Wood County, West Virginia, would be admissible at trial subject to any editing for irrelevant or other conflicting evidence.

The circuit court further noted that petitioner "seemed anxious to talk to the law enforcement officers and she very freely and voluntarily gave her account of what happened." The court also stated that petitioner "seemed very anxious to give her side of the story and what had happened, so she was very forthcoming in her answer. Clearly very voluntary from the outset."

---

[6] Petitioner avers that she has been diagnosed with unspecified mood disorder, unspecified trauma related order, stimulant use disorder, and unspecified personality disorder with borderline antisocial traits. She contends that she was "conditioned" to do what Mr. McCoy wanted her to do, so that she would not be verbally and physically abused by him.

Accordingly, based on the foregoing, when considering petitioner's motion to suppress in the light most favorable to the State and based upon the totality of circumstances, there is no error in the circuit court's denial of petitioner's motions to suppress. Petitioner's statements were voluntarily made.

In her second assignment of error, petitioner contends that she was denied the right to cross-examine law enforcement officers as to her recorded statement. At trial, while cross-examining Detective Stalnaker about petitioner's initial statement, respondent's counsel objected on the basis that the cross-examination was "just going back over, rehashing the statement." The objection was sustained by the trial court. Petitioner now argues that in sustaining this objection, the court limited petitioner's ability to submit the voluntariness of her statement to the jury for consideration.

This Court has previously held that "[a]s a general rule, the scope of cross-examination is coextensive with, and limited by, the material evidence given on direct examination." See generally, *State v. Koch*, 75 W. Va. 648, 84 S.E. 510 (1915). Further, we have found that "'the extent of the cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in the case of manifest abuse or injustice.' Syl. Pt. 4, *State v. Carduff*, 142 W. Va. 18, 93 S.E.2d 502 (1956)." Syllabus, *State v. Wood*, 167 W. Va. 700, 280 S.E.2d 309 (1981).

This Court has adopted

> . . . the "Massachusetts" or "humane" rule whereby the jury can consider the voluntariness of the confession, and we approve of an instruction telling the jury to disregard the confession unless it finds that the State has proved by a preponderance of the evidence it was made voluntarily.

*Vance*, 162 W. Va. at 467, 250 S.E.2d at 148, Syl. Pt. 4. Here, the jury was instructed that

> [i]n determining whether any such statement is reliable and credible, consider factors bearing on the voluntariness of the statement. For example, consider the age, gender, training, education, occupation, and physical and mental condition of the defendant, and any evidence concerning her treatment while under interrogation if the statement was made in response to questioning by government officials, and all the other circumstances in evidence surrounding the making of the statement.

> After considering all of this evidence, you may give such weight to the statement as you feel it deserves under all the circumstances. If you determine that the statement is unreliable or not credible, you may disregard the statement entirely.

6

Based upon our review of the record, we find that the sustaining of the objections of respondent's counsel was within the sound discretion of the circuit court and created no manifest abuse or injustice. The jury below was properly instructed as to the applicable law regarding the voluntariness of the petitioner's statements. Further, during closing arguments, petitioner's counsel presented arguments that petitioner's statements were not voluntary and were the product of "manipulation." Accordingly, we find no merit in petitioner's second assignment error.

For the foregoing reasons, we affirm petitioner's convictions.

Affirmed.

**ISSUED:** October 6, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton